UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE

UNITED STATES OF AMERICA                                    PLAINTIFF


vs.                                                  NO. 3:19-CR-177-CRS


MYRON L. DANIELS                                            DEFENDANT

## MEMORANDUM OPINION

This matter is before the Court on Defendant Myron L. Daniels' ("Daniels" or "Defendant") motion to suppress evidence seized from a vehicle and various properties that had been connected to Daniels during a police investigation into alleged drug trafficking. DN 30. The motion attacks the sufficiency of the affidavits used to obtain GPS tracking warrants for Daniels' cell phone and vehicle as well as the warrants that resulted in seizure of evidence. He contends that each of these searches lacked probable cause. *Id.* at 1. For the reasons stated below, the motion to suppress will be denied by separate order.

## I. BACKGROUND

Louisville Metro Police Department's ("LMPD") investigation of Daniels for suspected drug trafficking led to the issuance of eleven search warrants in total: GPS tracking warrants for Daniels' cell phone and his vehicle, both of which were renewed once; search warrants for residences at 5513 West Pages Lane, 4200 Fordson Way, and Apartment 304 in the Renaissance St. Andrews Apartments at 3320 Renwood Boulevard; search warrants for two garage units associated with the Renwood Boulevard address; a search warrant for a storage unit at 5215 Dixie Highway; and a search warrant for a gold Jeep that was present during the search of the Fordson

1

Way address.  Each of the physical searches resulted in the seizure of evidence except for the search of the storage unit at 5215 Dixie Highway.  *See* DN 33 at 6.

### A. GPS Tracking Warrants and Renewals

The first of the warrants to issue were the GPS tracking warrants for Daniels' cell phone and black Dodge Ram on August 24, 2018.  DN 30-7; DN 30-9.  These warrants were issued based on an affidavit by Detective Wesley Troutman of LMPD ("Detective Troutman" or "Troutman"). *Id.*  Detective Troutman's affidavit included statements regarding (1) tips from a confidential source in November and December of 2017 and a subsequent investigation into Daniels' connection to a drug trafficking conspiracy; (2) information from an additional confidential source in August 2018; and (3) a controlled buy that occurred within forty-eight hours of application for the warrants.

The affidavit begins by recounting how Detective Troutman first became familiar with Daniels during an investigation into a drug trafficking conspiracy in late 2017.  DN 30-7 at 8. Troutman began investigating Daniels in connection with the conspiracy when a confidential source ("CS #1") advised him on November 27, 2017 that Daniels "was trafficking large amounts of methamphetamine in the Louisville area," and that his "source of supply was a Hispanic male named 'Jorge.'"  *Id.*  A few days later CS #1 informed Troutman that Daniels "would be delivering a large sum of U.S. Currency to a Hispanic male named 'George' or 'Jorge' in the 2400 block of Emil Avenue in anticipation of receiving a large shipment of crystal methamphetamine."  *Id.*  In the affidavit, Troutman describes CS #1's reliability as follows:

> CS #1 has been established as a reliable confidential informant according to
> KRE 508, who is familiar with the way drugs are packaged, sold, and ingested due
> to his/her past involvement and experience in the illicit drug culture.  CS #1 was
> working in exchange for leniency on other potential charges.  CS #1 has provided
> information on Louisville drug traffickers that officers have corroborated.  CS #1's

information has been corroborated as truthful and accurate to this point and therefore officers believe CS #1 is reliable.

*Id.*

Acting on the information given by CS #1, Troutman researched Daniels' criminal history, which he found to be "extensive" and to "include drug trafficking charges that were amended to lesser charges in Jefferson County Kentucky District Court." *Id.* In addition, the affidavit describes the following investigative measure to corroborate CS #1's information:

> On December 1, 2017, Surveillance units observed DANIELS travel from the 4200 block of Fordson Way, Louisville, KY 40211 to 2407 Emil Avenue, Louisville, KY 40217. Detectives observed DANIELS take an indirect route to the location. Detective Troutman knows from training and experience that drug traffickers often conduct such evasive maneuvers as a means of "counter surveillance" to avoid being followed by law enforcement. DANIELS was observed entering the home and conducting a "short stay" (approximately 5-10 minutes). Detective Troutman believes this to have been a "short stay" in which Myron Daniels dropped off currency in anticipation of receiving a shipment of crystal methamphetamine in the near future, as corroborated by CS #1's statements.

*Id.* at 8–9. Further corroborating CS #1's information, investigation of the Emil Avenue address revealed that a man named Jorge Murillo, from Los Angeles, was renting the home through Airbnb. *Id.* at 9. The affidavit then details how the investigation eventually led to the seizure of twenty-five pounds of crystal methamphetamine and over $100,000 in U.S. currency, as well as the arrest of Jorge Murillo and several of his associates for conspiracy to possess with the intent to distribute crystal methamphetamine. *Id.* at 10. Although Detective Troutman did not have enough evidence to charge Daniels in the conspiracy, he states in the affidavit that he "believes that DANIELS was still anticipating a large shipment of methamphetamine at the time the above individuals were charged." *Id.*

Next, the affidavit states that on August 9, 2018, eight months after the December 2017 investigation into Daniels' alleged role in the trafficking conspiracy, a second confidential source

("CS #2") contacted Troutman with information that Daniels "was currently involved in the trafficking of large quantities of heroin, crystal methamphetamine and marijuana in the Louisville area." *Id.*  Detective Troutman describes CS #2's reliability in the affidavit in nearly identical terms as CS #1.  The affidavit states:

> CS #2 has been established as a reliable confidential informant according to KRE 508, who is familiar with the way drugs are packaged, sold, and ingested due to his/her past involvement and experience in the illicit drug culture.  CS #2 was working in exchange for leniency on other potential charges.  CS #1 has provided information on Louisville drug traffickers that officers have corroborated.  CS #2's information has been corroborated as truthful and accurate to this point and therefore officers believe CS #2 is reliable.

*Id.* at 11.

Troutman averred that CS #2 also gave details about where and how Daniels made drug transactions.  CS #2 stated that Daniels "conducts narcotics transactions at multiple residences on Fordson Way to include 4150 Fordson Way, 4206 Fordson Way and 4209 Fordson Way" as well as "the area of the Renaissance at St. Andrews Apartment homes located near the intersection of St. Andrews Church Road and Renwood Boulevard." *Id.* at 10.  CS #2 also stated that Daniels regularly conducts drug transactions inside of a black Dodge Ram pick-up truck. *Id.*  Lastly, CS #2 stated that Daniels "commonly uses an application called 'Snapchat' on the cellular phone associated with phone number (502) 999-0020 to arrange narcotics transactions." *Id.*

These details were largely corroborated when "Detective Troutman utilized CS #2 to conduct a controlled purchase of a quantity of heroin from Daniels." *Id.* at 11.  LMPD Narcotics detectives and Louisville DEA agents conducted physical surveillance during the controlled buy, but CS #2 did not wear an audio or video recording device. *Id.*  In his affidavit, Detective Troutman describes the controlled buy as follows:

> Prior to the execution of the controlled buy, Detective Troutman and Detective Mattiche met with the CS#2 at a pre-determined location.  CS#2 advised

that he had spoken with DANIELS via "Snapchat" and DANIELS had told him to meet him at the Renaissance at St. Andrews apartments.  Detective Troutman observed CS#2's "Snapchat log and observed that he had received a recent "Snap" from and [sic] individual named "Myron." The confidential source further stated that DANIELS' "Snapchat" account is under the username "Doghouse63. . . ."

Detective Troutman and Mattiche followed CS#2 to 3320 Renwood Boulevard and observe him park near a Black Dodge Ram pick-up truck . . . .  At 1647 hours, Detectives Troutman and Mattiche observed DANIELS exit the breezeway of 3320 Renwood Boulevard and approach the driver side door of the same pick-up truck listed above.  The confidential source then exited his vehicle and entered the passenger side of the same pick-up truck.  After a short amount of time, Detectives Troutman and Mattiche observed DANIELS and CS#2 exit the pick-up truck.  Daniels returned to 3320 Renwood Boulevard and entered an unkown apartment unit.  CS#2 returned to his vehicle and departed the area.

Detectives Troutman and Mattiche followed CS#2 to a pre-determined location and retrieved a quantity of suspected heroin packaged in a clear plastic sandwich bag (knotted/ in corner) from him.  CS#2 stated that DANIELS handed him the suspected heroin while they were both seated in the black Dodge Ram pick-up described above.

*Id.*

Based on the above information provided in Detective Troutman's affidavit, Judge Mary Shaw of the Jefferson County Circuit Court issued GPS Tracking warrants for the black Dodge Ram and the (502) 999-0020 phone number on August 24, 2018.  DN 30-7; DN 30-9.  These were valid for thirty days. *Id.*  During that period, Troutman's investigation resulted in further evidence that he believed suggested Daniels was dealing narcotics in the Louisville area and that further corroborated the information he initially received from CS #2.  Near the end of the thirty-day period, Troutman applied for a renewal of those warrants, which were issued on September 20, 2018.  DN 30-8; DN 30-10.

In addition to the contents of the initial affidavit, the affidavit for the renewed GPS tracking warrants described the latest evidence gleaned from Troutman's investigation.  In addition to observing Daniels exiting and entering Apartment 304 at Renwood Boulevard, physical

5

surveillance also connected Yuri Bell, one of the frequent contacts of (502) 999-0020, to that same address, further corroborating CS #2's statement that (502) 999-0020 belonged to Daniels. DN 30-8 at 9. Surveillance also connected Daniels and Yuri Bell with 5513 West Pages Lane, an address frequented by Daniels while making short stays at various other locations, which Detective Troutman believed to be indicative of narcotics trafficking. *Id.* at 12.

Electronic surveillance of the black Dodge Ram showed that it also made trips to a storage unit at Life Storage at 5215 Dixie Highway before and after making short stops in residential areas. *Id.* at 10. Storage facility records showed that Daniels rented unit 470, and security video footage shows Daniels placing a black Audi station wagon inside the unit, which Troutman believed to be the same vehicle he had seen Daniels driving to the Emil Avenue address during the 2017 investigation. *Id.* In addition, the affidavit states that electronic and physical surveillance showed Daniels making numerous short stays after leaving 4200 Fordson Way and 3320 Renwood Boulevard and often returning to those locations after a series of short stays. *Id.* at 11–12.

Finally, the affidavit describes a second controlled buy of heroin. This time, in addition to officers conducting physical surveillance, CS #2 wore an audio and video transmitting device during the buy. *Id.* at 13. Once again, CS #2 arranged the transaction through Snapchat and was told to meet at the Renaissance St. Andrews Apartments. *Id.* at 12–13. After arriving, CS #2 was told by Daniels to follow him to a nearby store. *Id.* at 13. As with the first controlled buy, CS #2 entered the passenger side of the black Dodge Ram where the transaction then took place. *Id.* Through the audio transmitting device, Troutman heard Daniels and CS #2 discuss the price of the heroin. *Id.* He also heard Daniels "instructing CS #2 to enter the store and make a purchase to make their visit to the store less suspicious." *Id.* Afterward, Troutman met CS #2 at a predetermined location where he retrieved a half ounce of suspected heroin from CS #2. *Id.*

6

Surveillance showed that Daniels returned to Apartment 304 at 3320 Renwood Boulevard after the transaction. *Id.*

### B. Premises and Vehicle Search Warrants

On October 17, 2018, after tracking Daniels' cell phone and vehicle for nearly two months, Detective Troutman applied for warrants to search six different locations that he believed were connected to Daniels' alleged drug activity. The warrant applications were supported by an affidavit that, in addition to what was stated in the previous affidavits, asserted facts obtained through both electronic and physical surveillance as well as a third controlled buy.

Much of the surveillance documented in the affidavit recounts numerous trips made by Daniels to the Renwood Boulevard, West Pages Lane, and Fordson Way addresses before and after short stays at other locations, which the affidavit describes as "indicative of DANIELS trafficking narcotics and storing said narcotics and currency which is the proceeds of said illegal drug sales at [those addresses]." DN 30-1 at 16; *see also id.* at 18, 19, 21. In addition, the affidavit describes an "open air sniff" conducted by Detective Brett Hankison's K-9, Franklin, of two storage garages—numbers seventeen and seventy-three—at the Renaissance St. Andrews Apartments, which were rented by Yuri Bell, the lessee of 3320 Renwood Boulevard Apartment 304. *Id.* at 20. Detective Troutman affirms in the affidavit that Daniels had been known to travel to these storage garages before and after short stays at other locations. *Id.* at 19. During the open-air sniff, "K-9 Franklin indicated to the presence of a narcotics odor at garage number seventy-three." *Id.* at 20. Troutman states that Daniels "travelled to the area of this same garage immediately before meeting with and selling heroin to CS #2" during the second controlled buy described above. *Id.*

Lastly, the affidavit also describes a controlled buy of four ounces of methamphetamine from Daniels that occurred on November 16, 2018 in the area of 3320 Renwood Boulevard. *Id.* at

20.   Detectives utilized CS #2 for the transaction, which was monitored through physical surveillance by several LMPD narcotics detectives and one DEA agent.  *Id.*  Troutman describes the controlled buy as follows:

> Detective Troutman met with CS #2 at a pre-determined location.  Detective equipped CS #2 with an audio/ video recording/ transmitting device for the controlled purchase.  CS #2 contacted DANIELS via "Snapchat" and arranged the purchase prior to meeting detective.  DS #2 showed Detective Troutman "Snapchat" messages in which DANIELS agreed to sell him 4 ounces of methamphetamine for $1,100.00.  Detective Troutman provided CS #2 with $1,100.00 of LMPD funds to complete the purchase.
>
> . . . Detective Bower observed CS #2 arriving in the area of 3320 Renwood Boulevard.  Electronic surveillance/ audio records indicate that DANIELS then entered CS #2's vehicle and sold him 4 ounces of methamphetamine for $1,100.00.
>
> . . . Detective Troutman followed CS #2 to a predetermined location and recovered 4 ounces of suspected methamphetamine packaged inside of a white grocery bag from CS #2.

*Id.*

Based on this information warrants were issued to search 3320 Renwood Boulevard Apartment 304 as well as the two storage garages connected to that address; 5513 West Pages Lane; 4200 Fordson Way; and Daniels' storage unit at 5215 Dixie Highway.  Upon execution of the warrants, officers seized quantities of suspected narcotics, including methamphetamine, heroin, codeine, pills, marijuana, and cocaine, as well as other drug paraphernalia, miscellaneous paperwork, cell phones, and a .22 caliber revolver.  *Id.* at 24–25; DN 30-2 at 24–25; DN 30-3 at 3; DN 30-5 at 23–24; DN 30-6 at 23–24.

During the execution of the search warrant at 4200 Fordson Way, a gold Jeep Grand Cherokee was parked in the driveway of the residence.  DN 30-3 at 3.  Detective Troutman had seen Daniels driving this vehicle multiple times throughout the course of his investigation.  *Id.* Detective J. McCauley and his K-9, Ripley, "conduct[ed] an exterior sniff of the vehicle.  During

the exterior sniff, K-9 Ripley indicated to the presence of a narcotic odor at the rear of the driver's side door seal." *Id.* Subsequently, Detective Troutman applied for a warrant to search the vehicle and submitted an affidavit that included the above information. *Id.* The warrant was issued on October 22, 2018. *Id.* at 7. Upon execution of the warrant, detectives found a loaded .380 caliber pistol and a box of photos. *Id.* at 8.

On October 16, 2019, Daniels was indicted for possession with intent to distribute methamphetamine, conspiracy to distribute and possess with intent to distribute methamphetamine, and possession of a firearm by a prohibited person. DN 10.

## II.  LEGAL STANDARD

The Fourth Amendment requires that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation." U.S. Const. amend. IV. The probable cause inquiry asks whether "there is a 'fair probability,' given the totality of the circumstances, that contraband or evidence of a crime will be found in a particular place." *United States v. Davidson*, 936 F.2d 856, 859 (6th Cir. 1991). When the sufficiency of an affidavit underlying a warrant is challenged, "[t]he duty of a reviewing court is simply to ensure that the magistrate had a 'substantial basis' for concluding that probable cause existed." *United States v. Gunter*, 551 F.3d 472, 479 (6th Cir. 2009). Courts "should not invalidate [warrants] by interpreting [affidavits] in a hypertechnical, rather than a commonsense, manner." *Illinois v. Gates*, 462 U.S. 213, 236 (1983) (internal quotation marks omitted) (alteration in original). In addition, "the magistrate's probable cause determination should be afforded great deference by the reviewing court." *Davidson*, 936 F.2d at 859. For this reason, "an issuing magistrate's discretion should only be reversed if it was arbitrarily exercised." *United States v. Allen*, 211 F.3d 970, 973 (6th Cir. 2000) (en banc).

9

### III.  DISCUSSION

In his motion to suppress, Daniels challenges each of the warrants issued in this case.  DN 30.  After attacking individual elements of each affidavit, he concludes that all of the affidavits were "conclusory, overbroad, stale, and wholly lacking in probable cause."  *Id.* at 9.  As such, Defendant claims that the issuing magistrate merely "rubberstamp[ed] the hunches of the officers." *Id.*  Furthermore, he argues that "[t]he affidavits in this case were so lacking in indicia of probable cause that the executing officers' reliance on them could not be reasonable," and, therefore, the good faith exception articulated in *United States v. Leon*, 468 U.S. 897 (1984) should not apply in this case.  *Id.*

#### A.  Initial Tracking Warrants and Renewals

Defendant argues that the initial tracking warrants lacked probable cause because CS #2's reliability was not adequately established in the affidavit.  *Id.* at 1.  Similarly, he claims that the first controlled buy was not sufficiently "controlled," making its value in the probable cause analysis hinge entirely on CS #2's reliability.  *Id.* at 2.

When a supporting affidavit rests, at least in part, on tips from a confidential source, courts should consider the informant's "veracity, reliability, and basis of knowledge."  *United States v. May*, 399 F.3d 817, 822 (6th Cir. 2005).  However, in *Illinois v. Gates* the Supreme Court made clear that these are not factors to be established with absolute certainty.  *Gates*, 462 U.S. at 233. "Instead, they are better understood as relevant considerations in the totality-of-the-circumstances analysis that traditionally has guided probable-cause determinations: a deficiency in one may be compensated for, in determining the overall reliability of a tip, by a strong showing as to the other, or by some other indicia of reliability."  *Id.*  Therefore, where some aspect of an informant's reliability is lacking on the face of the affidavit, police corroboration may "buttress[] the

10

informant's information." *United States v. Williams*, 224 F.3d 530, 532 (6th Cir. 2000); *see also United States v. Crawford*, 943 F.3d 297, 306–07 (2019) (explaining that "we typically do not require the officer to verify independently any of the information provided by the informant" when the officer has used the informant previously and has known him to give reliable information, but where the informant's credibility has not been previously established, officers may corroborate key information received from the informant" or "identify multiple sources providing the same information" to establish the informant's reliability). Furthermore, "[t]he additional evidence substantiating an informant's reliability need not be obtained from a source unrelated to the confidential informant—e.g., an independent police investigation or a second confidential informant—but may be any set of facts that support the accuracy of the information supplied by the informant." *May*, 399 F.3d at 824 (citing *Jones v. United States*, 362 U.S. 257, 271–72 (1960)).

In this case, the affidavit did not give details about CS #2's reliability as an informant. *See* DN 30-7 at 11. Curiously, in the paragraph describing CS #2's reliability, the affidavit states that "*CS #1* has provided information on Louisville drug traffickers that officers have corroborated." DN 30-1 (emphasis added). Although this statement is lacking in detail, if it stated instead that CS #2 had previously provided reliable information on other drug traffickers, it would help bolster the informant's reliability. As it stands, however, the statement is generic and does not, by itself, establish CS #2's veracity or reliability.

Defendant argues that since the vague description included in the affidavit fails to establish CS #2's reliability, the ensuing warrants based on the affidavit lacked probable cause. However, the statement regarding CS #2's reliability does not exist in a vacuum and must be considered in light of the totality of the circumstances. The information Detective Troutman received from CS #2 included details that would be difficult for someone to predict without some basis of knowledge.

11

The first controlled buy conducted by Detective Troutman corroborated many of these details, such as CS #2's statement that Daniels conducts drug transactions at the Renaissance St. Andrews Apartments, that he conducts these transactions inside of a black Dodge Ram, and that he uses the Snapchat app to set up and coordinate such transactions.

In *Gates*, an anonymous informant tipped the police that the defendants were drug traffickers and gave unique details about how the husband and wife arranged out-of-state pickups of narcotics. *Gates*, 462 U.S. at 225. Police subsequently corroborated some of these details, including that one of the defendants flew to Florida and that the family car was waiting there for him, which he then drove north toward the defendants' home in Illinois. *Id.* at 244. The Court concluded that a neutral magistrate could infer, "albeit not with certainty, that the informant's other assertions also were true," adding that because "an informant is right about some things, he is more probably right about other facts . . . including the claim regarding the [defendants'] illegal activity." *Id.* This reasonable inference, the Court stated, goes to the veracity and reliability of the anonymous informant. *Id.* Likewise, the corroboration of unique details regarding the defendants' *modus operandi* also suggests a probability that the informant had a firsthand, or at least reliable, basis of knowledge. *Id.* at 245–46. On these grounds, the Court reversed the Illinois Supreme Court's decision that the warrant at issue lacked probable cause. *Id.* at 246.

Here, the corroboration of unique details about where and how Daniels conducted drug transactions buttresses CS #2's tip. The investigative measures taken by Detective Troutman make it probable that the informant was being truthful and gained his knowledge through access to reliable information, whether it be from firsthand experience or from elsewhere. This helps make up for any deficiency in the statement about CS #2's reliability included in the affidavit. *United States v. Woosley*, 361 F.3d 924, 927 (6th Cir. 2004) ("[A]n affidavit that supplies little information

12

concerning an informant's reliability may support a finding of probable cause, under the totality of the circumstances, if it includes sufficient corroborating information.").

In addition, the detailed information given to Detective Troutman by CS #2 and the controlled buy must also be considered in light of the original tip from CS #1 and the ensuing 2017 investigation into Daniels' alleged involvement in the trafficking conspiracy that led to the prosecution of several individuals with whom Defendant was associated. The fact that Daniels arrived at the Emil Avenue address rented by a man named Jorge, as CS #1 had stated would happen, suggests that the other information Troutman received from CS #1 was also probably true—that this visit was for the purpose of delivering a large amount of cash in anticipation of a shipment of methamphetamine. After CS #2's subsequent tip, Troutman then had two independent sources saying that Defendant was trafficking drugs in the Louisville area, both of which had been at least partially corroborated by further police investigations.[1]  Any one of the three main elements of Troutman's initial affidavit—(1) CS #1's tip, (2) CS #2's tip, and (3) the August 2018 controlled buy—taken in isolation may not have been sufficient to issue the tracking warrants for Daniels' cell phone and vehicle. However, when considered together, the totality of the circumstances reveals a fair probability that Defendant was involved in trafficking drugs and that the black Dodge

---

[1] Defendant argues that the portion of the affidavit describing the tip Troutman received from CS #1 and the resulting December 2017 investigation was "stale and not relevant to any potential finding of probable cause in October 2018." DN 30 at 5. It is true that "stale information cannot be used in a probable cause determination." *United States v. Frechette*, 583 F.3d 374, 377 (6th Cir. 2009). However, even assuming that the eight-month period between the December 2017 investigation and the August 2018 tip from CS #2 had caused the information from CS #1 to grow stale, the tip from CS #2 and subsequent controlled buy corroborated CS #1's tip and put it back into play for purposes of a probable cause determination. *See United States v. Henson*, 848 F.2d 1374, 1381–82 (6th Cir. 1988) (observing that "[w]here recent information corroborates otherwise stale information, probable cause may be found") (quoting *Emery v. Holmes*, 824 F.2d 143, 149 (1st Cir. 1987)); *see also United States v. Greene*, 250 F.3d 471, 481 (6th Cir. 2001) ("Evidence of ongoing criminal activity will generally defeat a claim of staleness.").

Ram and the (502) 999-0020 number were instrumental to his alleged illegal activities.  Therefore, there was probable cause to issue the initial tracking warrants in this case.

Daniels claims that the controlled buy was not sufficiently controlled and that its usefulness for purposes of a probable cause determination hinges on the reliability of CS #2, which he argues was not established by the affidavit.  DN 30 at 2.   In particular, he takes aim at the fact that the affidavit does not state whether CS #2 or his vehicle were searched before the buy took place, that detectives did not directly observe a hand-to-hand transaction, and that detectives "did not observe the alleged Snapchat message arranging the buy."  *Id.*  These attacks "do not call for individual rebuttal.  The affidavit is judged on the adequacy of what it does contain, not on what it lacks, or on what a critic might say should have been added."  *Allen*, 211 F.3d at 975.  The affidavit does state that Detectives met with CS #2 before and after the transaction and conducted physical surveillance throughout.  DN 30-7 at 11.  Defendant cites no caselaw that would require certain procedures beyond these to be in place during the controlled buy.  Controlled buys have repeatedly been upheld as valid methods of corroborating tips from informants and as supporting probable cause determinations.  *See, e.g.*, *United States v. Hawkins*, 278 F. App'x 629, 635 (6th Cir. 2008); *see also United States v. Henry*, 299 F. App'x 484, 487 (6th Cir. 2008) ("[L]aw enforcement officers frequently employ controlled purchases of illegal narcotics in order to establish probable cause in circumstances where they cannot personally vouch for the reliability and credibility of a particular confidential informant.").  Although greater explanation of what methods were used to ensure the transaction occurred in a controlled environment would indeed serve to strengthen a finding of probable cause, its absence does not outweigh the totality of the circumstances that suggests probable cause did exist.  To accept Defendant's arguments and invalidate the warrants at issue here "would be tantamount to reviewing the sufficiency of the affidavit in a hypertechnical

14

manner instead of employing common sense and relying on the totality of the circumstances."
*Henry*, 299 F. App'x at 488.

Given that probable cause existed to issue the initial tracking warrants, whether the renewal
of those warrants was based on sufficient probable cause is a simpler question to answer. In
addition to the information provided in the initial affidavit, the application for renewal provided
extensive additional facts. Physical surveillance had connected Daniels and Yuri Bell, a frequent
contact of the (502) 999-0020 number, to the Apartment 304 at Renwood Boulevard, further
corroborating CS #2's statement that the phone number belonged to Daniels. *See* DN 30-8 at 9.
Surveillance also connected Daniels with the West Pages Lane and Fordson Way addresses as well
as Renwood Boulevard as locations frequented by Daniels while making short stays at various
other locations, which Detective Troutman believed to be indicative of narcotics trafficking. *Id.*
at 11–12. Lastly, the affidavit describes a second controlled buy once again set up by CS #2 using
the Snapchat app. *Id.* at 12–13. During this controlled buy, CS #2 was equipped with an audio
and video transmitting device through which Troutman heard Daniels and CS #2 discuss the price
of the heroin and heard Daniels "instructing CS #2 to enter the store and make a purchase to make
their visit to the store less suspicious." *Id.* at 13. As with the first controlled buy, the transaction
took place inside of Daniels' black Dodge Ram. *Id.* Thus, the renewal affidavit further reinforced
CS #2's reliability and provided further evidence that linked Daniels to the black Dodge Ram and
the (502) 999-0020 number. The affidavit here once again presented sufficient facts for a
magistrate to make a finding of probable cause.

**B. Premises and Vehicle Search Warrants**

In its response, the United States argues that Daniels did not have a reasonable expectation of privacy in all of the locations that were searched pursuant to the warrants and therefore lacks standing to challenge these searches.  DN 33 at 11; *see also Rakas v. Illinois*, 439 U.S. 128, 134 (1978) ("A person who is aggrieved by an illegal search and seizure only through the introduction of damaging evidence secured by a search of a third person's premises or property has not had any of his Fourth Amendment rights infringed.").  However, even assuming that Daniels does have standing, the Court finds that the searches were not illegal.

Defendant argues that the tracking information used to support the issuance of search warrants on October 17, 2018 was illegally obtained and therefore should be excluded.  DN 30 at 4.  However, as discussed above, the tracking warrants were lawful and supported by probable cause, so this argument is without merit.  Furthermore, he argues that even if the information regarding Daniels' "short stay" activity is included, it "adds only a small amount of credence to the attempted establishment of probable cause in the affidavits" because "[n]o transactions were witnessed during the surveillance" and "no arrests or seizures [were] made as a result of the surveillance of the short stays."  *Id.*  Once again, Defendant's arguments about what the affidavit lacks do not overcome what it contains.  *See Allen*, 211 F.3d at 975.

CS #2's tip that Daniels made narcotics transactions at the Renaissance St. Andrews Apartments at Renwood Boulevard was corroborated by three separate controlled buys that involved that location, and physical surveillance showed Defendant either leaving from or returning to Apartment 304 during these purchases.  Those facts alone create probable cause that evidence of a crime would be found at the Renwood Boulevard address.  Regarding the two garages that were searched at the Renwood Boulevard address, the following facts are relevant to the issuance of search warrants for those locations: (1) the garages were leased to the same person

16

as Apartment 304, Yuri Bell; (2) the open-air sniff that alerted detectives to the possible presence of contraband; (3) the possibility that Defendant's black Dodge Ram, which was used by Daniels during controlled buys at the Renwood Boulevard address, would be stored in one of the garages; and (4) Troutman's statements in the affidavit that Daniels had been known to travel to the garages before and after short stays at other locations and that Daniels had traveled to the area of garage number seventy-three immediately prior to the second controlled buy.  Taken together, these facts create a substantial basis upon which a magistrate could find that probable cause existed.

Likewise, the warrants for the Fordson Way and West Pages Lane addresses were supported by probable cause.  Troutman was first notified of Defendant's alleged illegal activities at Fordson Way through CS #2's tip, and the West Pages Lane address became a suspect location through Troutman's electronic surveillance of Defendant.  The investigation confirmed that the West Pages Lane and Fordson Way addresses were frequent destinations for Daniels either just before or just after conducting shorts stays at other locations.  Troutman believed this behavior to indicate that Defendant was trafficking narcotics and storing either drugs or cash from drug transactions at the above addresses.  On this point, courts may give "considerable weight to the conclusion of experienced law enforcement officers regarding where evidence of a crime is likely to be found and [the courts are] entitled to draw reasonable inferences about where evidence is likely to be kept, based on the nature of the crime and type of offense." *United States v. Williams*, 544 F.3d 683, 686 (6th Cir. 2008) (alteration in original).  Therefore, under the totality of the circumstances, the above information supports a finding of probable cause with respect to the Fordson way and West Pages Lane addresses.

The last premises search warrant left to discuss is that for Daniels' storage unit at 5115 Dixie Highway.  In addition to surveillance that showed Daniels made trips to this location before

17

and after conducting short stays in residential areas, Daniels was also seen storing an Audi station wagon inside the unit, which Troutman believed to be the same vehicle Daniels was seen driving to the Emil Avenue address in December 2017 to allegedly drop off a large sum of cash in anticipation of a shipment of methamphetamine.  When considered in light of the other evidence of Daniels' alleged drug trafficking activity, this information was sufficient to support a finding of probable cause.

Finally, the warrant to search the gold Jeep found parked in the driveway of the Fordson Way residence was also supported by probable cause.  A K-9 sniff is not a search under the Fourth Amendment so long as the K-9 team is lawfully present where the sniff occurs.  *United States v. Place*, 462 U.S. 696, 707 (1983); *United States v. Reed*, 141 F.3d 644, 650 (6th Cir. 1998). Because the detectives were on the property to execute a lawful search warrant, their presence at the location of the sniff was lawful.  Defendant suggests that the sniff was somehow improper because "[t]he search warrant for Fordson Way does not reference a driveway in the description of the property to be searched."  DN 30 at 8.  The sniff itself was not a search, so the detectives did not exceed the scope of the warrant by conducting the open-air sniff around the vehicle.  Once the positive indication occurred as a result of the sniff, detectives then had probable cause to search the vehicle.  *See United States v. Diaz*, 25 F.3d 392, 393 (6th Cir. 1994).  Instead, Detective Troutman applied for a search warrant.  The positive indication of narcotics made by Ripley and the fact that Troutman had seen Daniels operating the vehicle on multiple occasions during his investigation created probable cause to justify issuing the search warrant.[2]

---

[2] In his motion to suppress, Defendant states that "[t]he magistrate was completely misled as to how the Jeep was obtained."  DN 30 at 8.  While implying the warrant may have been obtained through improper means, Defendant does not explain how this is so.  Therefore, the Court regards this statement as being without significance.

18

Since the Court finds that probable cause existed to issue each of the warrants in this case, it is unnecessary to consider the parties' arguments regarding the good faith exception under *United States v. Leon*, 468 U.S. 897 (1984).

## IV.  CONCLUSION

For the reasons discussed herein, Defendant's motion to suppress, DN 30, will be denied by separate order.

December 22, 2020

Charles R. Simpson III, Senior Judge
United States District Court